UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| GEORGE KONEL,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>WK KELLOGG CO., GARY PILNICK, WENDY ARLIN, R. DAVID BANYARD JR., MICHAEL CORBO, ZACHARY GUND, RAMON MURGUÍA, JULIO NEMETH, and MINDY SHERWOOD,<br><br>　　　　　Defendants. | Case No. 25-cv-9418 |

# COMPLAINT

Plaintiff George Konel ("Plaintiff"), by and through Plaintiff's attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.　This is an action brought by Plaintiff against W.K. Kellogg Co. ("WK Kellogg" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with WK Kellogg, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed acquisition of WK Kellogg by Ferrero International S.A., a Luxembourg public

1

limited company ("Ferrero" or "Parent").

2. On or about July 10, 2025, WK Kellogg entered into an agreement and plan of merger, (the "Merger Agreement"), whereby Ferrero will acquire WK Kellogg (the "Proposed Transaction") and shareholders of WK Kellogg common stock will receive $23.00 in cash for each share of WK Kellogg common stock they own (the "Merger Consideration").

3. On or about August 7, 2025, in order to convince WK Kellogg's shareholders to support the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Schedule 14A Preliminary Proxy Statement (the "Proxy Statement") with the Securities and Exchange Commission ("SEC"). As detailed below, the Proxy Statement contains materially incomplete and misleading information concerning potential conflicts of interest that may have tainted the fairness opinion that was provided by Goldman Sachs & Co. ("Goldman Sachs"), WK Kellogg's financial advisor.

4. The special meeting of WK Kellogg shareholders (the "Special Meeting") will be scheduled and the definitive proxy statement that will be used to solicit stockholders' final votes will be disseminated to WK Kellogg's shareholders in the coming days. It is imperative that the material information that has been omitted from the Proxy Statement be disclosed immediately so public stockholders may make an informed determination as to how to respond when they receive the forthcoming definitive proxy statement.

5. For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking further steps to consummate the Proposed Transaction, unless and until the material information discussed below is disclosed to WK Kellogg's shareholders, or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

6. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

7. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Vigman*, 764 F.2d at 1316.

8. Venue is proper in this Court under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b)(2) because Defendants are subject to personal jurisdiction in this District and a substantial part of the events or omissions giving rise to the claim occurred, as the claims at issue here are grounded in the failure to fully and accurately disclose the potential conflicts that Goldman Sachs faced in connection with the compensation expected to be received in connection with the advisory work it performed for WK Kellogg's sister company, Kellanova, which is headquartered in this District. Further, upon information and belief, shareholders of WK Kellogg reside in this District and Defendants were aware that the Proxy Statement would be reviewed in this District. *See Sarantakis v. Gruttadauria*, No. 02 c 1609, 2003 U.S. Dist. LEXIS

3

4002, at *23 (N.D. Ill. Mar. 17, 2003) ("Venue is appropriate in a securities case where a defendant causes false or misleading information to be transmitted into a judicial district."); *see also Oxford First Corp. v. PNC Liquidating Corp.*, 372 F. Supp. 191, 197 (E.D. Pa. Mar. 6, 1974) ("Venue will be sustained in a securities case where a defendant causes false or misleading information to be transmitted into a judicial district, even if the defendant never has been physically present in that district."); *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90, 106 (10th Cir. 1971) (finding venue proper in the District of Utah where the defendant released a false and fraudulent press statement that was printed in the Wall Street Journal that was circulated in Salt Lake City, Utah).

## PARTIES

9. Plaintiff is, and has been continuously throughout all times relevant hereto, an owner of WK Kellogg common stock.

10. Defendant WK Kellogg is a Delaware corporation, an iconic North American food company, and a leading manufacturer, marketer, and distributor of branded ready-to-eat cereal, with its products manufactured in the United States, Canada, and Mexico, and marketed in the United States, Canada, and the Caribbean. WK Kellogg's common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "KLG."

11. Defendant Gary Pilnick ("Pilnick") is the Company's President and Chief Executive Officer, and the Chairman of the Company's Board of Directors. Before WK Kellogg spun off Kellanova, Pilnick was Kellanova's Vice Chairman and Chief Legal Officer.

12. Defendant Wendy Arlin ("Arlin") is a director of the Company.

13. Defendant R. David Banyard, Jr. ("Banyard") is a director of the Company.

14. Defendant Michael Corbo ("Corbo") is a director of the Company.

15. Defendant Zachary Gund ("Gund") is a director of the Company. Gund is also a

4

director of Kellanova.

16. Defendant Ramon Murguía ("Murguía") is a director of the Company.

17. Defendant Julio Nemeth ("Nemeth") is a director of the Company.

18. Defendant Mindy Sherwood ("Sherwood") is a director of the Company.

19. The defendants identified in paragraphs 11 through 19 are collectively referred to as the "Individual Defendants" or the "Board."

## SUBSTANTIVE ALLEGATIONS

**Background of the Proposed Transaction**

20. Defendant WK Kellogg is a Delaware corporation, an iconic North American food company, and a leading manufacturer, marketer, and distributor of branded ready-to-eat cereal, with its products manufactured in the United States, Canada, and Mexico, and marketed in the United States, Canada, and the Caribbean. WK Kellogg's common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "KLG."

21. Founded more than a century ago, Kellogg Company (now known as Kellanova) was a leading food company, boasting a broad array of food brands in the snacking and cereals markets.

22. In 2022, Kellanova announced its intention to spin off its North American cereal business, with the spin-off being completed in October 2023 and forming WK Kellogg.

23. On August 14, 2024, Kellanova announced that it had entered into a merger agreement pursuant to which it would be acquired by Mars, Incorporated (the "Kellanova Acquisition").

24. On or about September 26, 2024, Kellanova issued its definitive proxy statement in connection with the Kellanova Acquisition, which indicated that Goldman Sachs had acted as a

financial advisor for Kellanova and that the "engagement letter between Kellanova and Goldman Sachs provides for a transaction fee of approximately $93.2 million upon the completion of the Merger, $5 million of which was payable upon the announcement of the Merger."

25. On November 4, 2024, Kellanova announced that its stockholders had voted to approve the Kellanova Acquisition.

26. On July 31, 2025, Kellanova issued a press release announcing, in part, that the Kellanova Acquisition "is expected to close towards the end of 2025."

**The Proposed Transaction and the Materially Incomplete and Misleading Proxy Statement**

27. On or about July 10, 2025, WK Kellogg and Ferrero issued a joint press release to announce the Proposed Transaction, stating in part:

**FERRERO TO ACQUIRE WK KELLOGG CO**

*Acquisition supports Ferrero's portfolio expansion and growth in North America by adding WK Kellogg Co's highly complementary, iconic cereal brands, serving consumers across more occasions throughout the day*

*WK Kellogg Co shareowners to receive $23.00 per share in cash representing 40% premium to 30-day volume weighted average trading price*

LUXEMBOURG and BATTLE CREEK, Mich., July 10, 2025 — The Ferrero Group ("Ferrero" or the "Company") and WK Kellogg Co (NYSE: KLG) today announced that they have entered into a definitive agreement under which Ferrero has agreed to acquire WK Kellogg Co, for $23.00 per share in cash, representing a total enterprise value of $3.1 billion. The acquisition, which includes the manufacturing, marketing and distribution of WK Kellogg Co's iconic portfolio of breakfast cereals across the United States, Canada and the Caribbean, is part of Ferrero's plan for strategic growth and expands the Company's reach across more consumption occasions with renowned beloved brands and strong consumer relevance.

This transaction represents another chapter in Ferrero's proven strategy to acquire, invest in, and grow iconic brands as it continues to enhance its overall footprint and product offerings in North America. As a result of this strong growth, in North America Ferrero and its affiliated companies currently count more than 14,000 employees across 22 Plants and 11 offices. The North America portfolio includes

6

Nutella®, Kinder®, Tic Tac®, and Ferrero Rocher® as well as iconic American brands such as Butterfinger®, Keebler®, and Famous Amos®. It also includes confectionery brands like Jelly Belly®, NERDS®, and Trolli® as well as frozen treat brands like Blue Bunny®, Bomb Pop®, and Halo Top®.

Drawing upon its previous successful acquisitions in the United States, Ferrero plans to invest in and grow WK Kellogg Co's iconic brands including Kellogg's Frosted Flakes®, Kellogg's Froot Loops®, Kellogg's Frosted Mini Wheats®, Kellogg's Special K®, Kellogg's Rice Krispies®, Kellogg's Raisin Bran®, Kashi®, Bear Naked®, and more that are well-loved by American consumers. WK Kellogg Co is a renowned company, in operation for nearly 120 years, and a leader shaping the future of breakfast. Ferrero, which also brings over 75 years of heritage, has long admired WK Kellogg Co's legacy and is proud to be entrusted with carrying these iconic American brands forward.

"I am thrilled to welcome WK Kellogg Co to the Ferrero Group. This is more than just an acquisition - it represents the coming together of two companies, each with a proud legacy and generations of loyal consumers," said Giovanni Ferrero, Executive Chairman of the Ferrero Group. "Over recent years, Ferrero has expanded its presence in North America, bringing together our well-known brands from around the world with local jewels rooted in the U.S. Today's news is a key milestone in that journey, giving us confidence in the opportunities ahead."

"We believe this proposed transaction maximizes value for our shareowners and enables WK Kellogg Co to write the next chapter of our company's storied legacy," said Gary Pilnick, Chairman and Chief Executive Officer of WK Kellogg Co. "Since becoming an independent public company in October 2023, we have made excellent progress on our journey to become a more focused and more profitable business – driven by our tremendous people and a winning culture – all while building a strong foundation for future growth. Joining Ferrero will provide WK Kellogg Co with greater resources and more flexibility to grow our iconic brands in this competitive and dynamic market. As a family-owned private company with values in line with our founder W.K. Kellogg, Ferrero provides a great home for our people and has a track record of supporting the communities in which it operates. We look forward to collaborating with their team to deliver on the great promise of cereal, explore opportunities beyond cereal, and help us bring our best to consumers every day."

Lapo Civiletti, Chief Executive Officer of the Ferrero Group, added, "WK Kellogg Co, a trusted company with beloved brands, represents a meaningful addition to the Ferrero Group. Enhancing our portfolio with these complementary household brands marks an important step towards expanding Ferrero's presence across more consumption occasions and reinforces our commitment to delivering value to consumers in North America."

> Similar to WK Kellogg Co, Ferrero traces its roots to humble beginnings as a family business, still operating in the town where they were founded. After the transaction closes, Battle Creek, MI will remain a core location for the company and will be Ferrero's headquarters for North America cereal.
>
> **Transaction Details**
>
> Under the terms of the agreement, Ferrero will acquire all outstanding equity of WK Kellogg Co for $23.00 per share in cash, representing a total enterprise value of $3.1 billion. Upon the successful completion of the transaction, shares of WK Kellogg Co's common stock will no longer trade on the New York Stock Exchange, and the company will become a wholly owned subsidiary of Ferrero.
>
> The agreement has been unanimously approved by the Board of Directors of WK Kellogg Co.
>
> The transaction is subject to approval by WK Kellogg Co shareowners, regulatory approvals and other customary closing conditions and is currently expected to close in the second half of 2025.
>
> The W.K. Kellogg Foundation Trust and the Gund Family have entered into agreements pursuant to which they have committed to vote shares representing 21.7% of WK Kellogg Co's common stock, as of July 7, 2025, in favor of the transaction.
>
> Lazard is acting as lead financial advisor with BofA Securities acting as co-advisor and Davis Polk & Wardwell LLP serving as legal counsel to Ferrero. Goldman Sachs & Co. LLC and Morgan Stanley & Co. LLC are acting as financial advisors and Kirkland & Ellis LLP are serving as legal counsel to WK Kellogg Co.

28. On or about August 7, 2025, WK Kellogg, in order to solicit approval to consummate the Proposed Transaction from the public shareholders, the Board authorized the filing of the materially incomplete and misleading Proxy Statement with the SEC.

29. The Proxy Statement is materially incomplete and misleading because it misleads WK Kellogg's investors about a potential conflict of interest that Goldman Sachs faced, namely the compensation that Goldman Sachs received in connection with the Kellanova Acquisition.

30. Because Goldman Sachs provided a fairness opinion with the respect to the Proposed Transaction, federal regulations required that the Proxy Statement clearly, accurately, and fully

8

describe any material relationships that existed during the past two years (including "any compensation received *or to be received* as a result" of the relationships between Goldman Sachs and WK Kellogg or any of its affiliates. *See* 17 C.F.R. §§ 229.1015(b), 240.14a-3(a)(1), 240.14a-9, 240.14a-101 Item 14(b)(6).

31. The Proxy Statement purported to satisfy this requirement by stating:

> Goldman Sachs has provided certain financial advisory and/or underwriting services to Kellogg Foundation Trust and its affiliates from time to time for which Goldman Sachs Investment Banking has received, and may receive, compensation, including having acted as financial advisor to Kellanova (formerly Kellogg Company), an affiliate of Kellogg Foundation Trust, in connection with its spinoff of WK Kellogg in October 2023 and as financial advisor to Kellanova, an affiliate of Kellogg Foundation Trust, in connection with its pending sale to Mars, announced in August 2024. During the two-year period ended July 10, 2025, Goldman Sachs has recognized compensation for financial advisory and/or underwriting services provided by Goldman Sachs Investment Banking to Kellogg Foundation Trust and/or its affiliates of approximately $22 million. As of July 10, 2025, Goldman Sachs Investment Banking was not currently mandated by Kellogg Foundation Trust and/or its Related Entities (excluding WK Kellogg and its subsidiaries) to provide to any such person financial advisory and/or underwriting services. In addition, as of July 10, 2025, Goldman Sachs Investment Banking was not currently soliciting Kellogg Foundation Trust and/or its Related Entities (excluding WK Kellogg and its subsidiaries) to work on financial advisory and/or underwriting matters for any such persons on which it had not been mandated. Goldman Sachs may also in the future provide financial advisory and/or underwriting services to the Relevant Parties and their respective affiliates for which Goldman Sachs Investment Banking may receive compensation.

Proxy Statement at 66.

32. The Proxy Statement specifically identified the Kellanova Acquisition as a source of compensation paid to Goldman Sachs and indicated that Goldman Sachs "recognized" $22 million in compensation from for financial advisory services provided to Kellogg Foundation Trust and/or its affiliates (including Kellanova) "[d]uring the two-year period ended July 10, 2025." This $22 million amount in historical compensation from the Kellogg Foundation Trust and its affiliates

(including Kellanova) is generally in-line with the $18 million to $20 million that the Proxy Statement indicated Goldman Sachs would receive in connection with the Proposed Transaction.

33. The Proxy Statement omitted the plainly material fact that the compensation remaining to be received by Goldman Sachs in connection with the closing of the Kellanova Acquisition substantially dwarfs the $22 million that Goldman Sachs has "recognized" during the two-year period ended July 10, 2025.

34. A company cannot conceal the amount of compensation that will be paid upon the closing of a pending transaction with an affiliated company by disclosing compensation received but arbitrarily excluding compensation that is "to be received." *See* 17 C.F.R. § 229.1015(b)(4) ("Describe any material relationship that existed during the past two years or is mutually understood to be contemplated and any compensation received *or to be received* as a result of the relationship").

35. The failure to disclose this information is of particular importance here, where Goldman Sachs apparently reiterated its fairness opinion without even recalculating the valuation analyses that underpinned its opinion notwithstanding the fact that those valuation analyses were based on financial projections that were prepared in light of "an error in certain of WK Kellogg's historical consolidated financial statements that caused understatements of inventories and overstatements of cost of goods sold." *See* Proxy Statement at 47.

36. Kellogg Foundation Trust, Defendant Pilnick, and Defendant Gund are affiliates of both WK Kellogg and Kellanova. *Cf. SEC v. Cavanagh*, 445 F.3d 105, 111 (2d Cir. 2006) ("It is well-established that an 'affiliate' of the issuer—'such as an officer, director, or controlling shareholder'—'ordinarily may not rely upon the Section 4(1) exemption.'"). Indeed, the Proxy Statement specifically identifies the Kellanova Acquisition as the basis of a portion of the compensation that Goldman Sachs received.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

48. Plaintiff incorporates each and every allegation set forth as if fully set forth herein.

49. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

50. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

51. The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

52. Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the misleading Proxy, which attempts to minimize the number of shares voting against the Proposed Transaction.

53. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants,

by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

54. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

55. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligent, recklessness, or intentional conduct.

56. The Company is also deemed negligent, reckless, or intentional as a result of the Individual Defendants' intent in preparing and reviewing the Proxy.

57. The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are

not corrected prior to the Shareholder Vote. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

58. Plaintiff incorporates each and every allegation set forth as if fully set forth herein.

59. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

60. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

61. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They

13

were thus directly involved in preparing this document.

63. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

63. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

64. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

65. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or taking any steps to consummate the Proposed Transaction, until the Company issues curative disclosures that fully address the deficiencies in the Proxy Statement;

B. Rescinding, to the extent already implemented, the Merger Agreement or any of the

terms thereof, or granting Plaintiff rescissory damages;

      C.      Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

      D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

      E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 8, 2025

**OF COUNSEL**

**ADEMI & FRUCHTER LLP**
Guri Ademi (*pro hac vice forthcoming*)
Jesse Fruchter (*pro hac vice forthcoming*)
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel. 414-482-8000
Fax 414-482-8001
gademi@ademilaw.com
jfruchter@ademilaw.com

*Attorneys for Plaintiff*

**ADEMI & FRUCHTER LLP**

By: */s/ John D. Blythin*
Shpetim Ademi (WI SBN 1026973)
John D. Blythin (IL SBN 6281648)
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel. 414-482-8000
Fax 414-482-8001
sademi@ademilaw.com
jblythin@ademilaw.com

*Attorneys for Plaintiff*